UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANGELA STALEY,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>U.S. BANK NATIONAL ASSOCIATION,<br>U.S. BANCORP,<br><br>　　　　　　　Defendants. | Case No. 1:10-cv-00591-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendants' Motion for Summary Judgment (Dkt. 31). The Court heard oral argument on August 2, 2012 and took the matter under advisement. For the reasons explained below, the Court will deny the motion.

## FACTUAL BACKGROUND

Plaintiff Angela Staley alleges she was terminated from her position with Defendants U.S. Bank National Association and U.S. Bancorp (together "U.S. Bank") because she was pregnant and scheduled to take paid maternity leave.

Staley was initially hired by U.S. Bank in July 2004 as a teller coordinator at a bank branch in the Boise, Idaho area. In 2008, she was promoted to manager of another

Boise area bank branch. While in that position, she had her first child. She took twelve weeks of leave, as allowed by the Family and Medical Leave Act ("FMLA"). There is no allegation that Staley experienced any discrimination or retaliation related to her first pregnancy.

In January 2009, Staley was promoted to a corporate trainer position within U.S. Bank's Human Resources Department. The position involved training U.S. Bank employees at various branches, and it required Staley occasionally to travel for work. Staley was told by her initial training supervisor, Summer Miller, that she had a $35 per day allowance to use on food, which she was permitted to charge to her corporate credit card. The parties contest the amount of training on the use of the corporate credit card that Staley received.

On approximately four business trips, Staley's family traveled with her. Staley asked and was given permission for them to accompany her. Miller testified that she advised Staley that they were allowed to travel with Staley so long as it did not result in any greater expense for U.S. Bank. On several occasions during those trips Staley used her corporate credit card to purchase food for her husband and daughter, though she never exceeded her $35 daily allotment. Staley estimates the total amount spent on food for her husband and child was approximately $100. *Compl*. ¶ 29, Dkt. 1.

In late 2009, Staley became pregnant with her second child. Miller announced

Staley's pregnancy on a conference call with their training team, and Staley "received a lot of congratulations." *Staley Dep*. 88:22.

In January 2010, Douglas Strackbein replaced Miller as Staley's immediate supervisor. Staley was planning to take twelve weeks of maternity/FMLA leave beginning on April 26, 2010. Because of the length of Staley's employment at U.S. Bank, her leave would have been fully paid. Staley began working with Strackbein to organize coverage of those trainings that she would be unavailable to conduct.

On April 2, 2010, an anonymous person called U.S. Bank's ethics hotline and reported that Staley had used her corporate credit card to make purchases for her family during business trips. Lawrence Christensen, a Senior Investigator in U.S. Bank's Corporate Security Investigations Department, was assigned to investigate.

Christensen interviewed Staley on Friday, April 9, 2010. Staley acknowledged that she had purchased food for her family while traveling. She told Christensen that her understanding was that she could use the $35 travel allotment as a daily per diem which she could spend on her family. At that time, she estimated that the total amount she had spent on her family was roughly $60. In a follow up report, Christensen wrote that the $60 figure, based on his review of the records, was "a realistic figure." *Mot. for Summ. J.*, Ex. D-3 at 2, Dkt. 32-12. Christensen concluded that Staley had violated the company's Code of Ethics, which provides, "The corporate credit card should be used for business-

related expenses only . . . ." *Mot. for Summ. J.*, Ex. A-2 at 8, Dkt. 32-4. Christensen reported his conclusion to Strackbein.

According to Staley, Strackbein called her that evening to "check on how [she] was doing." *Staley Aff.* ¶ 34, Dkt. 36-13. He told her not to worry because any violation was not severe. They spoke again on the following day, a Saturday, and he told her again that nothing was likely to happen. *Staley Dep.* 131:5-11.[1]

On Monday, April 12, 2010 Staley reported to work. Staley's cubicle was directly next to Christensen's office. During the day, Staley overheard Christensen discussing her situation on the phone at least twice. At approximately 1:15 PM, she overheard a phone conversation which she surmised was between Christensen and someone in human resources, based on the context of the conversation. She heard Christensen say, "Yeah, she is two weeks from having a baby. She is pregnant." *Staley Aff.* ¶ 47. He also mentioned that she was scheduled to take pregnancy leave. Staley testified that the tone of Christensen's comments was negative: "[T]he tone that was used was very different from what I had ever heard before when I was -- had received congratulations." *Staley Dep.* 89:22-24.

Staley testified that during the course of the day she spoke directly with both

---

[1] Strackbein denies that he ever had a conversation with Staley in which he told her not to worry.  Strackbein Dep. 58:18.  However, for purposes of U.S. Bank's motion for summary judgment, the Court will accept, as it must, Staley's version of the conversation.

Christensen and Strackbein. Christensen stopped by her office at around noon. He told

her he had turned the decision over to Strackbein and the human resources department.

Strackbein called her shortly afterwards. He told her that no decision had been made and

that he could not make the decision because he had not supervised Staley for long

enough. Strackbein told her that the decision would be made by Christensen and the

human resources department. Staley had a subsequent conversation with both Christensen

and Staley, and they each told her again that the other person was responsible for the

decision.

During his deposition, Christensen testified that he had no role in determining the

discipline imposed; he acted solely as a fact-finder. Strackbein testified that he passed the

decision up to his supervisor, Jill Costa, who consulted her boss, Susan Strand, who in

turn consulted the head of U.S. Bank's training division, Randy Johnston. Strackbein

testified that "ultimately Randy Johnston made that decision [to terminate Staley]"

*Strackbein Dep*. 56:4. Strackbein testified that he did not inform Costa that Staley was

pregnant.

At 5:00 PM, Darlene Bills, a local human resources employee, escorted Staley to

an office where they dialed into a conference call. Strackbein and Kerry Mitchell, another

human resources employee, attended by telephone. Mitchell told Staley she was

terminated from her employment for using her corporate credit card for personal expenses

in violation of U.S. Bank's Code of Ethics.

U.S. Bank did not fill Staley's former position until early in September 2010, roughly four months after Staley was terminated. At the time Staley was terminated, U.S. Bank had "implemented a broad initiative to reduce costs" as a result of the economic downturn. *Defs.' Statement of Undisputed Facts* ¶ 26, Dkt. 31-2.   Strackbein testified, however, that terminating Staley did not save U.S. Bank money because of the expenses of training her replacement and flying in trainers to conduct necessary classes in the interim. However, he acknowledged that he had not "put [expenses and savings] out on a spreadsheet." *Strackbein Dep*. 90:17-18.

Staley filed this suit on December 1, 2010. Her complaint alleges that she was terminated because of her pregnancy in violation of (1) Title VII of the federal Civil Rights Act, (2) the federal Family and Medical Leave Act, and (3) the state of Idaho's Human Rights Act.

## LEGAL STANDARD

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not . . . a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at

327. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Liberty Lobby,* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to

interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

## ANALYSIS

**1.     Title VII and Idaho's Human Rights Act**

Under Title VII, it is unlawful for an employer to discriminate against an employee "because of" sex, race or any other protected characteristic. 42 U.S.C. § 2000e-2(a)(1). Title VII, as amended by the Pregnancy Discrimination Act, defines discrimination "because of sex" as including discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Id.* § 2000e(k). An employer violates Title VII if a protected characteristic is a "motivating factor" in the employment action; it need not be the only factor. *Id.* § 2000e–2(m).

Plaintiff's state law claim is evaluated on the same terms. Idaho's Human Rights Act prohibits discrimination "because of . . . sex." Idaho Code § 67-5909. Claims under the Act are evaluated under the "quantum of proof and standards promulgated in discrimination cases arising under Title VII." *Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979).

At the summary judgment stage, a plaintiff may frame their evidence using the burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805-06 (1973). *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854-55 (9th Cir. 2002) (en

banc). The plaintiff may also eschew the *McDonnell Douglas* framework and simply introduce "sufficient evidence–direct or circumstantial–of discriminatory intent." *Id.* at 855. In this case, both parties invoke the *McDonnell Douglas* burden shifting, and the Court will evaluate the evidence under that framework.

Under *McDonnell Douglas*, the employee must first establish a prima facie case of discrimination. *Id.* The burden of production then shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* Once the employer meets this burden, the employee must show that the employer's reason is a pretext for unlawful discrimination. *Id.* The Court addresses each of these steps in turn.

## A.      *Prima Facie Case*

While "the elements and contours of a prima facie case will differ according to the facts at hand," *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010), the plaintiff must generally show that: "(1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated [non-pregnant individuals] were treated more favorably, or her position was filled by a [non-pregnant individual]," *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). The requisite degree of evidence to establish a prima facie case of discrimination is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.

1994).

Defendants concede that Plaintiff has satisfied the first three elements of her prima facie case, as it is undisputed that Staley was pregnant, qualified for her position, and terminated by U.S. Bank. It is the fourth element which is in dispute. Defendants contend that Staley cannot show that "nonpregnant employees who have deliberately misused their corporate credit cards by purchasing meals or other items . . . for a nonbusiness purpose have not been terminated." *Defs.' Mem. in Supp. of Mot. for Summ. J.* at 9, Dkt. 31-1. The Court disagrees with the Defendants' characterization of the fourth element, as well as Defendants' suggestion that Staley has not satisfied it.

First, Defendants overlook that Staley may also prove the fourth element by showing that she was replaced by an individual who was not a member of the protected class, i.e., who was not pregnant. *See Villiarimo*, 281 F.3d at 1062. Defendants do not dispute that Staley's position was eventually filled by Vicki Sanders, who was not pregnant. *See Strackbein Dep*. 80:8. This is sufficient in and of itself to fulfill the fourth element.

Further, Staley identifies four instances in which similarly situated employees who were not pregnant misused their corporate credit card and were not terminated. Staley states that she personally observed on separate occasions two U.S. Bank trainers, Mark Thayer and Kelly Hess Dunbar, use their credit cards to purchase food for individuals

**MEMORANDUM DECISION AND ORDER - 10**

other than themselves including, in both instances, Staley's daughter. Further, Christensen

testified that he once used his credit card in an improper manner and was chastised but

not terminated. U.S. Bank also apparently turned over discovery in *Brockbank v. U.S.*

*Bancorp*, no. 09-CV-00037-EJL, 2011 WL 2550540 (D. Idaho June 24, 2011), which

disclosed that U.S. Bank employee Michael Sullivan inadvertently placed personal

charges on his credit card and was not terminated. These instances are sufficient to meet

Plaintiff's "minimal" burden of showing that similarly situated individuals who were not

pregnant were treated more favorably than Staley. *Wallis*, 26 F.3d at 889.[2]

### B.    *Legitimate Reason*

Plaintiff does not contest that Defendants have offered a legitimate, non-

discriminatory reason for Staley's termination – the fact that Staley used her corporate

credit card for non-business related expenses, namely purchasing food for her family.[3]

U.S. Bank's Code of Ethics and Business Conduct states,

> At U.S. Bank, employees who travel or have a business need to incur

---

[2] The Court recognizes that Defendants contend in their reply brief that these individuals were not similarly situated to Staley. The Court addresses these arguments in its discussion of pretext. *See Hawn*, 615 F.3d at 1158 (explaining that courts "generally analyze an employer's reasons for why employees are not similarly situated at the pretext stage of *McDonnell Douglas*" because the plaintiff's burden at the prima facie stage is "much lower").

[3] Plaintiff does argue that she was not properly trained on the use of her business credit card, and that U.S. Bank rules were not clear as to whether employees were allowed to use their daily food allowance to purchase food for others. However, Plaintiff frames these arguments as evidence that U.S. Bank's decision to terminate Staley was pretextual.

reimbursable business expenses may obtain a U.S. Bank corporate credit card. The corporate credit card should be used for business-related expenses only and may not be used to secure personal cash advances or for personal purchases, except in the case of non-reimbursable personal expenses incurred in the course of business activities that are incidental in nature and where it is not otherwise practical for the employee to pay for those expenses separately. Such incidental personal expenses must be separately itemized on the employee's travel and expense reimbursement form and paid by the employee in full when due. All employees are required to follow U.S. Bank's guidelines regarding business-related expenses and expense reimbursement procedures. Employees are responsible for the timely submission of expenses and ensuring payment on their corporate card account is up to date. Misuse of the corporate credit card, falsification of business expenses, repeated late payments or excessive personal use of the corporate credit card may result in termination of card privileges and/or disciplinary action up to and including termination.

*Mot. for Summ. J.*, Ex. A-2 at 8, Dkt. 32-4. The Court agrees that in light of U.S. Bank's

stated rule that an employee's "corporate credit card should be used for business-related

expenses only," Defendants have produced a legitimate non-discriminatory reason for

Staley's termination. *Id.*

### C.    *Pretext*

Where the defendant has shown a non-discriminatory reason for termination, the

plaintiff must then show that the articulated reason for her termination is pretextual, either

through evidence of discriminatory intent or by demonstrating that the employer's

explanation is unworthy of credence because "it is internally inconsistent or otherwise not

believable." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007). Evidence of

pretext is considered cumulatively. *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002).

As a preliminary matter, the Court must address Plaintiff's burden of production at this stage. Defendants characterize all of Plaintiff's evidence of pretext as circumstantial evidence. They therefore assert that Plaintiff can survive summary judgment only if that evidence is "specific and substantial." *Defs.' Mem. in Supp. of Mot. for Summ. J.* at 4 (internal quotation marks omitted). It is unsettled, however, whether the differing burden for circumstantial and direct evidence remains the law of the circuit. In *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003), the Supreme Court held that under Title VII, a plaintiff need not present direct evidence of discrimination to merit a mixed-motive jury instruction. In that context, the Court observed:  "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Id.* at 100 (internal quotation marks omitted).

The Ninth Circuit subsequently applied *Desert Palace* in the summary judgment context, concluding that "the distinction between direct and circumstantial evidence is irrelevant to determining what analytical framework to apply." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). The *McGinest* court held that the plaintiff was required to introduce "very little" evidence of discriminatory motive to survive

summary judgment. *Id.* at 1124 (internal quotation marks omitted); s*ee also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006) ("Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence."). Confusion persists, however, because other Ninth Circuit opinions continue to rely upon a distinction between direct and circumstantial evidence. *See, e.g.*, *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). The Ninth Circuit "has not clearly resolved this issue." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1091 (9th Cir. 2008). The Court need not attempt a resolution either, because the burden of production is not material to the resolution of this motion. The Court concludes that Plaintiff has offered direct evidence of discrimination as well as specific and substantial circumstantial evidence.

Direct evidence is "evidence which, if believed, proves the fact of discriminatory animus without interference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotation marks omitted). In this case, the direct evidence of discrimination is Staley's testimony that she overheard Christensen discussing her pregnancy in a negative tone with someone from human resources, hours before she was terminated. Staley says that she overheard Christensen say "Yeah, she is two weeks from having a baby. She is pregnant." *Staley Aff*. ¶ 47. He also mentioned that Staley's pregnancy leave was impending. *Id.*

Christensen's alleged statements, on their face, are not necessarily evidence of animus. It is plausible, for instance, that Christensen was benignly expressing his concern about the impact that U.S. Bank's decision might have on Staley, given that she was pregnant. The alleged statements amount to direct evidence in this instance, however, because Staley testified that the tone of Christensen's comments was negative: "[T]he tone that was used was very different from what I had ever heard before when I was -- had received congratulations." *Staley Dep*. 89:22-24. Whether a statement constitutes evidence of discrimination can turn on "context, inflection, [or] tone of voice," as it does here. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam).

The relevance of Christensen's comments also depends on whether they were related to the decisional process. Stray remarks unrelated to the decisional process are alone inadequate to constitute sufficient evidence of pretext. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). On the other hand, "a single discriminatory comment by a . . . decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

Here, the evidence as to which persons were involved in the decision to terminate Staley is contradictory. Even the Defendants' evidence leaves significant ambiguities as to the role of the various decisionmakers. In an initial answer to Plaintiff's interrogatories,

Defendants stated that Kerry Mitchell was involved in the decision. *Mem. in Opp. to Defs.' Mot. for Summ. J.*, Ex. G, at 4, Dkt. 36-9. After Strackbein's deposition, Defendants supplemented their answer to add that Jill Costas, Susan Strand, and Randy Johnston were involved. *Mem. in Opp. to Defs.' Mot. for Summ. J.*, Ex. H, at 2-3, Dkt. 36-10. Strackbein did not mention Kerry Mitchell. Strackbein testified that "ultimately Randy Johnston made [the] decision." *Strackbein Dep.* 56:4. It is unclear from Strackbein's testimony what role, if any, he or the other managers below Johnston played in the decision.

Plaintiff has presented sufficient evidence which, accepted as true for the purposes of the motion, establishes that Christensen's comments were directly related to the adverse employment action at issue. It is undisputed that Christensen was responsible for the investigation into Staley's use of her corporate credit card. He reported his conclusion to Strackbein and drafted a report which was sent to U.S. Bank's human resources department. This fact establishes that Christensen "influenced . . . the decisionmaking process," even if he was not actually a decisionmaker. *Id.* Further, according to Staley, Strackbein told her the decision would be made by Christensen and "human resources." Finally, even if Christensen was not a decisionmaker, Staley testified that from the context of the conversation, it was apparent that he was talking about her disciplinary situation to someone in the human resources department. Viewing the evidence in the

light most favorable to the non-moving party, as we must, Plaintiff has shown an

adequate nexus between the allegedly discriminatory remarks and U.S. Bank's

decisionmaking process.

The Court also concludes that Plaintiff has introduced evidence showing that

similarly situated non-pregnant individuals who misused their corporate credit cards were

not subject to termination. "Evidence that one or more similarly situated individuals

outside of the protected class received more favorable treatment can constitute sufficient

evidence of discrimination for a Title VII plaintiff to prevail." *Beck v. United Food &*

*Commercial Workers Union Local 99*, 506 F.3d 874, 883 (9th Cir. 2007). Whether

employees are similarly situated "is a fact-intensive inquiry, and what facts are material

will vary depending on the case." *Hawn*, 615 F.3d at 1157. To be similarly situated,

employees must be "similar in all *material* respects." *Id.* (internal quotation marks

omitted).

Before discussing the individuals identified by Plaintiff, the Court first must

address the meaning of "similarly situated" in the context of this case. Though U.S.

Bank's Code of Ethics states that misuse of a corporate credit card "may result in

termination of card privileges and/or disciplinary action up to and including termination,"

Defendants claim, and reaffirmed during oral argument, that U.S. Bank's policy is

effectively one of "zero tolerance." *Defs.' Statement of Facts*, p. 4, Dkt. 31-2. Both

Strackbein and Christensen testified that U.S. Bank has a zero tolerance policy.[4]

*Strackbein Dep*. 37:14-25; *Christensen Dep*. 117:16-19. Christensen testified that the size

of the loss to the company "is inconsequential" in evaluating an ethics violation.

*Christensen Dep*. 69:24. Strackbein stated that the employee's work performance was not

a factor in the disciplinary decision. *Strackbein Dep*. 38:19. Defendants rely on this zero

tolerance policy to explain why Staley was terminated, despite the fact that the size of the

loss to the company was less than $100 and she otherwise was a highly regarded

employee.

    Plaintiffs contend that if U.S. Bank's policy is one of zero tolerance, then the class

of similarly situated individuals must be defined more broadly than the Defendants have

suggested in their briefing. Defendants have argued that "the similarly situated

individuals to whom Staley must compare herself are, very narrowly, individuals in her

business line in Idaho that U.S. Bank has discovered to have deliberately misused the

---

[4] Strackbein explicitly characterized U.S. Bank's policy as one of "zero tolerance." *Strackbein Dep*. at 37:18. However, he also testified that the discipline would depend on the circumstances of the offense. *See id.* at 40:15-18 (Q. And I think that's what you were explaining to me, that you would actually look to the particular circumstances involved? A. Correct.); *see also id.* at 54:18-25 to 55:1-7. Strackbein offered contradictory testimony as to whether he would also consider past disciplinary action against the employee in determining appropriate discipline. *Compare* Strackbein at 38:14-16 ("Q. And would you also consider whether they had ever received any disciplinary action in the past? A. Yes."), *with id.* at 39:3-10 ("[Y]ou could go back and look and see if [the employee] had a significant event . . . . But I don't do that. In other words, I'm just looking at that particular thing at that particular moment in time."). It is uncontested that Staley had never before been disciplined.

corporate credit card by purchasing . . . items that are not for business purposes." *Defs.'*

*Mem. in Supp. of Mot. for Summ. J.*, p. 5 n.1. However, the Court agrees with Plaintiff's

contention that this cramped view of "similarly situated" is not supported by the evidence.

First, Strackbein testified that U.S. Bank's emphasis on ethics and its zero tolerance

policy is a corporate wide approach, not limited to the training division. *Strackbein Dep*.

37:17-25. Second, there is no basis for Defendants' suggested geographic limitation,

given the fact that most of the decisionmakers were not located in Idaho; Strackbein was

in Washington and Johnston was located in either Florida or Georgia. *Id.* at 56:6-8.

Finally, there is conflicting evidence whether U.S. Bank's disciplinary policy is

linked to a determination that an employee acted with a particular state of mind. There is

some evidence that Strackbein considered Staley's intent. *See Strackbein Dep*. 54:18-20

("I worked with [Christensen] to make a determination as to what did we have here? Did

we have a misunderstanding."). On the other hand, Christensen testified that he, as the

fact-finder, determined that Staley did not act with "criminal intent." *Christensen Dep*.

78:12-13. He also expressed that he did not know for a fact whether Staley's actions were

based on a misunderstanding, and that "as far as the discipline and the termination, [his]

opinion doesn't matter."[5] *Id.* at 93:14-15. Christensen's written summary of the

---

[5] Christensen went on to state his opinion that it was unlikely Staley's actions were the
result of a misunderstanding. Nonetheless, his statement was premised by an explanation as to
why his opinion was irrelevant to the disciplinary determination. *Christensen Dep*. 93:21-23.

MEMORANDUM DECISION AND ORDER - 19

investigation does not include any determination that Staley deliberately violated

company policy. *Resp. to Mot. for Summ. J.*, Ex. I, at 2, Dkt. 36-11. Further, Staley

indicates that Strackbein told her that Christensen stated to him that "the situation

appeared to be a misunderstanding." *Staley Aff.* ¶ 34. Based upon these facts, the Court

cannot conclude that U.S. Bank's decision to terminate Staley was premised on the

conclusion that she acted deliberately, or that U.S. Bank's zero tolerance policy applies

only to deliberate misconduct. With this backdrop, the Court turns to the four employees

relied upon by Staley as "similarly situated."

Plaintiff's evidence relates to misuse of company credit cards by (1) Mark Thayer,

(2) Kelly Hess Dunbar, (3) Lawrence Christensen, and (4) Michael Sullivan. Staley states

that Thayer, a senior U.S. Bank trainer, used his corporate card to purchase dinner for

Staley and Staley's daughter during a visit to Boise. *Staley Aff.* ¶ 14. Staley states that

Dunbar, another U.S. bank trainer, used her corporate credit card during a visit to Boise to

buy appetizers for a group of individuals that included Staley's daughter. *Id.* at ¶ 15.

Staley claims that she informed Christensen about Thayer and Hess Dunbar's actions

during her meeting with him. With respect to Christensen, Plaintiff relies on

Christensen's deposition testimony, where he described an episode when he used his

corporate card to buy a "thank you" lunch for several U.S. Bank employees. He was told

"in no uncertain terms" that this was an improper use of the corporate credit card, but he

was not terminated. *Christensen Dep*. 121:14-15. Finally, with respect to Michael

Sullivan, Plaintiff points to discovery produced by U.S. Bank in *Brockbank*, 2011 WL

2550540, where a U.S. Bank answer to an interrogatory stated that Sullivan

"inadvertently" placed charges for dog boarding on his corporate credit card. *Resp. to*

*Mot. for Summ. J.*, Ex. I, at 2, Dkt. 36-11. Sullivan apparently was not terminated. *Id.*

Defendants attempt to identify distinctions between each of these individual's

actions and Staley's actions to show that they were not similarly situated. With respect to

Thayer and Dunbar, Defendants argue that Staley did not present evidence to show (1)

that they used their corporate credit card to purchase the meals, (2) that they did not

afterwards itemize the personal expenses, (3) that they were not authorized to make the

purchase by a supervisor, (4) or that they were subject to an ethics complaint. Defendants

also argue that Staley has not presented evidence that Dunbar was not pregnant, and that

Dunbar's violation -- buying appetizers to share with others -- was different than Staley's

violation. The Court is not persuaded.

To begin, Staley testified that both Thayer and Dunbar used their corporate credit

card for their respective purchases. *Staley Aff*. ¶ 14 (Thayer paid for meal with corporate

credit card); *Staley Dep*. 123:4-5 ("[Dunbar] then purchased the appetizers on her

corporate card that day."). Second, Defendants overlook that because the question of

whether an employees is similarly situated is one of fact, *Hawn*, 615 F.3d at 1157, the

Court is required to draw all "justifiable inferences" in the non-moving party's favor, *Liberty Lobby*, 477 U.S. at 255. Staley's description of Thayer's and Dunbar's statements and actions support the reasonable inference that they were subject to the same policy as Staley. Defendants' hypotheses as to how their actions might have been authorized, without any supporting evidence, does not make the inference in Plaintiff's favor implausible.

Staley also testified that she informed Christensen of Thayer's and Dunbar's alleged violations in her interview. Defendants argue that, unlike Staley, there is no evidence either employee was the subject of an ethics complaint. The Court agrees that there are conceivable reasons why the form in which a corporation is notified of a potential ethics violation could be material in determining its response. But there is no such evidence allowing the Court to draw that conclusion in this instance. Given U.S. Bank's purported zero tolerance policy, the fact that a corporate compliance officer was made aware of two violations and took no action in response supports the inference that Staley's misuse of her credit card might not have been the actual reason for her termination.

The Court disagrees that Dunbar's action, in buying appetizers to share with other individuals, including a non-employee (Staley's daughter) is necessarily distinguishable conduct from Staley's action of buying food for others. Both instances involve the

individual using their personal allowance to feed others. Defendants' claim that there is

no evidence Dunbar was not pregnant is also not a material distinction. There is no

indication that Staley told Christensen Dunbar was pregnant, and it is therefore

reasonable to infer that Christensen assumed she was not.

Defendants also object to the comparison to Christensen's instance of misuse

because they claim that the evidence does not show whether Christensen actually

submitted his dinner purchase for reimbursement or whether he was subject to discipline.

The Court agrees that some of the background details of Christensen's use of the credit

card are not entirely clear. However, Christensen discussed the incident as an example of

a time in which he violated U.S. Bank's "policy and procedure." *Christensen Dep*. 121:5-

6. When asked, Christensen was unable to explain how his misuse of the company credit

card was different than Staley's misuse: "Q: How is that different, you having a

misunderstanding of the policy versus Angela having a misunderstanding? . . . . THE

WITNESS: You need to ask HR . . . [T]here is a very thin line maybe sometimes. I don't

know." *Id.* at 121:21-5 to 122:1-4. Given that Christensen himself was unable to identify

a material distinction between his situation and Staley's situation, the hypothesized

factual differences suggested by Defendants do not make the inference that Christensen

and Staley are similarly situated unreasonable.

With respect to Sullivan, Defendants argue that Sullivan's purchase was

inadvertent in the sense that he mistakenly used his corporate credit card when making a personal purchase. Defendants argue that, in contrast, Staley deliberately used her credit card to make the purchases. As explained, however, the evidence viewed in the light most favorable to Plaintiff does not establish that U.S. Bank made a determination as to Staley's state of mind or that any such determination is material to U.S. Bank's imposition of discipline. Further, accepting Staley's assertions as true, her misuse of the corporate credit card was inadvertent because, like Sullivan, she did not have the intent to violate company policy. Defendants argument is that Sullivan's violation of policy was less severe than Staley's. However, Staley testified that she was initially told by Strackbein that "the severity of the situation was minor" and unlikely to warrant any discipline. *Staley Aff.* ¶ 34. The Sullivan example demonstrates that, in at least some situations, U.S. Bank *does* consider the context for the breach of company credit card policy in determining appropriate discipline, which undermines Defendants' explanation for why they did not do so in Staley's case.

Given this evidence, which is sufficient to create a triable issue as to whether Staley was terminated because she was pregnant, the Court will deny Defendants' motion for summary judgment on these claims.

**2.    Family and Medical Leave Act**

The FMLA entitles employees to take twelve weeks of leave for the birth of a

child. 29 U.S.C. § 2612(a)(1)(A). It is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" the rights guaranteed by the FMLA. *Id.* § 2615(a)(1). Interference with FMLA rights includes "discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c); *see also Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) (holding that Labor Department's interpretation of "interfere" in 29 C.F.R. § 825.220(c) is reasonable).

Courts do not apply *McDonnell Douglas* burden shifting to an FMLA claim because "the employer's intent is irrelevant to a determination of liability." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). Instead a plaintiff must show that their plan to take "FMLA-protected leave constituted a negative factor in the decision to terminate her." *Bachelder*, 259 F.3d at 1125. A plaintiff can prove the claim "as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Id.*

Here, the Court concludes that Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether Staley's plan to take FMLA-protected leave was a factor in her termination. Plaintiff's evidence supporting her FMLA claim is the same as the Court found persuasive in its discussion of pretext in Plaintiff's Title VII and IHRA claim: (1) the alleged fact that a decisionmaker commented negatively on Staley's

pregnancy and planned leave hours before she was terminated and (2) the evidence that

U.S. Bank has not terminated similarly situated non-pregnant individuals for violations of

the company's credit card policy.

## ORDER

**IT IS ORDERED:**

1.     Defendants' Motion for Summary Judgment (Dkt. 31) is **DENIED**.



DATED:  **August 3, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge